UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ERIC BOLTZ, *et al.*,<br><br>              Plaintiffs,<br><br>   vs.<br><br>UNITED PROCESS CONTROLS, *et al.*,<br><br>             Defendants. | 1:16-CV-703<br><br>DISTRICT JUDGE SUSAN J. DLOTT<br><br>ORDER DENYING MOTION FOR<br>PARTIAL SUMMARY JUDGMENT |

This matter is before the Court on the Defendants' Motion for Partial Summary Judgment (Doc. 27). Defendants United Process Controls ("UPC"), Nitrex Metals, Inc., and Novacap, Inc. move to dismiss the disability discrimination and retaliation claims asserted by UPC's former employee, Plaintiff Eric Boltz, in Counts I and III of the Amended Complaint (Doc. 19). Defendants assert that Boltz was not qualified for his executive position at UPC following a traumatic accident because he was not able to perform the essential function of working on-site on a regular and predictable basis. Because the Court finds that genuine issues of material fact remain in dispute, the Court will **DENY** the Motion for Partial Summary Judgment.

I.     **BACKGROUND**

A.     **Factual History**

The following facts are derived from Defendants' Amended Proposed Undisputed Facts (Doc. 28) and Plaintiffs' Responses thereto (Doc. 32-2), or from the Amended Complaint (Doc. 19) and Answer (Doc. 20), except where otherwise noted.

1.     **Boltz's Employment History with UPC**

Defendant UPC provides process control, flow control, and automation solutions to furnace original equipment manufacturers and customers with thermal processing equipment. Defendant Nitrex Metal, Inc. ("Nitrex") is a Canadian corporation that wholly owns UPC.[1] Plaintiff alleges that Defendant Novacap is a Canadian private equity firm that owns a majority interest in Nitrex, but Defendants deny this allegation. (Doc. 20 at PageID 276.) UPC was Plaintiff Eric Boltz's employer for purposes of federal and Ohio disability statutes at all times relevant hereto. UPC was formed in 2008 when Nitrex purchased the assets of Marathon Sensors, Inc., a company owned by Plaintiffs Eric and Yvonne Boltz.[2] Because the pending motion primarily concerns Eric Boltz, he will be referred to herein as Eric Boltz or simply Boltz, while Yvonne Boltz always will be referred to by her full name.

After UPC was formed, Boltz served as the Vice President for Operations ("VP Operations") and Yvonne Boltz as the Vice President of Energy Environmental Solutions.[3] Boltz managed two facilities in the United States, one in West Chester, Ohio and one in Milwaukee, Wisconsin, and two facilities in China. UPC did not have a written job description for the position of VP Operations. (Oleszkiewicz Dep., Doc. 33-1 at PageID 604.)[4] Boltz regularly and consistently worked out of the West Chester facility during his sixteen-year career with UPC and its predecessor companies. UPC also assisted Boltz in maintaining an office at his

---

[1]  Although Novacap asserts that it is without information to admit or deny these first two allegations, UPC and Nitrex admit they are true. (Doc. 19 at PageID 275–76.)

[2]  Although Nitrex and Novacap deny this allegation for lack of information, UPC admits it is true. (Doc. 19 at PageID 278.)

[3]  Although Nitrex and Novacap deny this allegation for lack of information, UPC admits it is true. (Doc. 19 at PageID 279.)

[4]  Paul Oleszkiewicz is the President of UPC.

home.  (Boltz Dec., Doc. 32-1 at PageID 552–53.)  He had a computer with multiple displays and teleconference equipment at his home office.  (*Id.* at PageID 552.)  UPC purchased Microsoft Office for Boltz's home computer and paid an annual fee for a home VPN/firewall to ensure a secure connection from his home computer to the office.  (*Id.*)  Boltz asserts that he participated in weekly management conference calls, participated in international calls, and performed technical duties from home.  (*Id.* at PageID 553.)

Defendants assert that Boltz's job duties required him to travel approximately thirty days per year, including to Milwaukee, to the two China facilities, and to visit customers.  (Beach Dec., Doc. 27-1 at PageID 490.)  Boltz responds that there was no business need for him to travel to China in late 2015 or during the first quarter of 2016.  (Boltz Dec., Doc. 32-1 at PageID 553–554; Oleszkiewicz Dep., Doc. 33-1 at PageID 588–89.)

### 2.    Boltz's Injury and Attempted Return to Work

Boltz suffered an injury while bicycling on September 24, 2015 causing him to become paraplegic.  (Doc. 27-1 at PageID 453.)  Boltz participated in emailed discussions regarding UPC business during his hospital stay.  (Oleszkiewicz Dep., Doc. 33 at PageID 611–614; Doc. 33-2 at PageID 671, 674–75, 678.)  Other participants in the emailed discussions worked in Ohio, Wisconsin, Canada, China, Germany, and Poland.  (Doc. 32-1 at PageID 554.)

Boltz submitted a Disability Claim Form to UPC on or about October 16, 2015 signed by Dr. Michael Watts as his attending physician.  (Doc. 27-1 at PageID 451–55.)  Dr. Watts stated on that date that Boltz was "currently unable to work at all[,]" but also opined that Boltz "eventually could return to office/managerial work" and gave an estimated return to work date of four to six months.  (*Id.* at PageID 454.)

On October 27, 2015, Paul Oleszkiewicz, UPC's President, sent separate letters to Eric and Yvonne Boltz notifying them that UPC was exercising its right to cancel the extensions of their employment contracts. UPC said that the cancellations were a formality to allow the company to update the contract language.[5]

On November 4, 2015, Oleszkiewicz met with Boltz at his home to talk about the immediate future of the company. (Oleszkiewicz Dep., Doc. 33-1 at PageID 591.) Oleszkiewicz asked Boltz how he would lead the company from a wheelchair. (*Id.* at PageID 593.) He told Boltz that he believed it would be "difficult" for Boltz to lead the company from his wheelchair because "a leader has to do sales and be the face of the company." (*Id.*) Boltz responded to Oleszkiewicz that his leadership came from his brain, not from legs. (*Id.*)

By November 9, 2015, Boltz's paid leave from UPC was exhausted. He received only short-term disability in the amount of 60% of his regular compensation from that point forward. (Boltz Dec., Doc. 32-1 at PageID 554.)

Also on November 9, 2015, Oleszkiewicz gave himself responsibility over UPC China, taking the responsibility from Boltz. (Oleszkiewicz Dep., Doc. 33-1 at PageID 597; Doc. 33-2 at PageID 657.) He told Boltz that he would return the responsibility "when the situation permit[ted]." (Oleszkiewicz Dep., Doc. 33-1 at PageID 597.)

On November 17, 2015, UPC terminated the employment of Yvonne Boltz, purportedly for "lack of success in providing value to the company."[6] Boltz alleges that UPC cut off his home access to the corporate computer server the same day. Oleszkiewicz does not remember

---

[5] Although Nitrex and Novacap deny this allegation for lack of information, UPC admits it is true. (Doc. 19 at PageID 285.)

[6] The quotation comes from the Amended Complaint and Answer. The parties have not identified where in the record the termination letter can be found.

the date that UPC cut off Boltz's access to the corporate server, but he stated that it was during his medical leave. (Oleszkiewicz Dep., Doc. 33-1 at PageID 601.) Written correspondence indicates that UPC might not have cut his computer access until on or about November 23, 2015. (Doc. 27-1 at PageID 461.) Oleszkiewicz testified that he did not want Boltz to "interfere with company business when he was on a sick leave." (Doc. 33-1 at PageID 601–02.)

On November 20, 2015, Boltz sent an email to Oleszkiewcz and Jennifer Beach, the UPC controller and a human resources manager, stating that his "primary physician ha[d] declared [him] fit for duty!" (Doc. 27-1 at PageID 457; Doc. 33-1 at PageID 603.) He further stated that he "plan[ned] on working at home . . . [as] a reasonable accommodation" and that he would "be coming in to the office for partial days as [he] work[ed him]self back to a more traditional schedule." (Doc. 27-1 at PageID 457–58.) Boltz did not support his email with a report or release from his primary physician, so UPC requested those materials. (*Id.* at PageID 460–64.)

UPC denied Boltz's request to return to work in a letter dated November 23, 2015 from Oleszkiewicz to Boltz. (*Id.* at PageID 460–61.) Oleszkiewicz stated that UPC could not "allow [Boltz] to return to work before [he was] safely able to do so." (*Id.*) He relied on the initial opinion of Dr. Watts from October 13, 2015 that Boltz would be unable to return to work for four to six months. (*Id.*) He also discounted the significance of the work Boltz had done at home since his injury:

> Reading occasional emails or documents at home, which your email indicates you have done to some limited extent does not of course indicate that you have by any means been functioning as the Operating officer of two or really, three distant locations of the Company under your sphere of responsibility. Among other things, the Operating Officer of UPC needs to maintain a consistent presence in the Cincinnati office and more than occasional visit to our office in Milwaukee, as well as China, as to which I have indicated to you that I do not intend to retain permanent responsibility.

(*Id.*)  Finally, Oleszkiewicz stated that Beach was serving as the acting General Manager and that Boltz should direct all disability, medical, and related information to her.  (*Id.*)

On November 24, 2015, Boltz provided UPC with a Work Note from his neurosurgeon, Dr. Vincent DiNapoli, signed that same date and a Call Documentation record from his primary physician, Dr. Douglas Moody.  (*Id.* at PageID 471–76.)  Dr. DiNapoli stated in the Work Note that Boltz could "work from home with no more than 15 lbs lifting."  (*Id.*)  The Call Documentation record from Dr. Moody stated as follows:

> Pt requests that we authorize him to be able to return to work Monday, November 23rd allowing him to work from home
> _____
> Dr. Moody verbally verified all of the above on Friday, November 20th 2015.

(*Id.* at PageID 476.)

On November 25, 2015, Boltz contacted Michel Korwin, Nitrex's President, by email. (Doc. 33-2 at PageID 657–59.)  Boltz expressed his concern that the company's actions had made it "crystal-clear" that the company did "not wish for [him] to return to work" as the VP Operations.  (*Id.* at PageID 657.)  These actions included the termination of his and Yvonne Boltz's employment contracts, Oleszkiewicz's question whether Boltz could lead the company from a wheelchair, Yvonne Boltz's termination from employment, his loss of job responsibilities, and the refusal of the company to allow him to return to work.  (*Id.* at PageID 657–59.)

On November 30, 2015, after the Thanksgiving holiday, Oleszkiewicz sent an email to Boltz, which he copied to Beach, "to clarify [Boltz's] status with the Company."  (Doc. 27-1 at PageID 466.)  Oleszkiewicz stated that Boltz's duties "require[d his] attendance in the office, [*sic*] and reasonable travel" and that "the Company [did] not believe it [was] appropriate, or healthy" for Boltz to try to return to work at that time.  (*Id.*)

Boltz responded on December 1, 2015 that his plan was to work from home with the goal of returning to the office for full days by the end of December 2015. (*Id.* at PageID 467.) He also stated that he could travel by car and would be cleared to travel by air. (*Id.*) On December 2, 2015, Oleszkiewicz "rejected" Boltz's proposal to return to work in an email to Boltz, which was copied to Beach:

> Neither working from home, nor working, essentially, part-time, meet the requirements of your position. Your email ignores that neither of your physicians released you to work in the office, and neither released you to work full-time, to my knowledge.
>
> The Company already has rejected this offer by you.
>
> Please keep us informed about the status of your recovery. To be clear, we are not requiring that [you] be able to work a normal work week of 45–55 hours as expected of other executives before you will be permitted to return. However, and as previously indicated, we do expect before you return, you be able to work, reliably and regularly, on a full-time or nearly full-time basis, to travel as necessary, and reasonably soon return to a full, normal UPC executive work schedule.

(*Id.*)

Dr. DiNapoli issued a second Work Note on December 8, 2015 authorizing Boltz to work from home with a goal of return to work in the office:

> Restrictions:
>
> May work from home. As pain allows, can work at office for periods of time with a goal of working up to a fully [*sic*] day by the end of year 2015 after TLSA brace is no longer needed. 01/01/2016

(*Id.*at PageID 478.)

On December 15, 2015, Michel Korwin responded to Boltz's November 25, 2015 email. (*Id.* at PageID 480–83.) Korwin denied that UPC did not want Boltz to return to the company as the VP Operations. (*Id.*) However, he expressed concerns that Boltz had made "outright accusations" against the company and that he might be engaging in a "campaign of

communications to 'set up' the company for a lawsuit." (*Id.*) He further stated as follows in that regard:

> Your letter and some of your actions, however, since your injury, cause me concern about your management judgment and willingness to return as a cooperative, collegial, and, frankly, honest member of the Executive Group. Before you can be reinstated, you and I must first clear certain doubts related to your conduct and judgment.

(*Id.* at PageID 480.) Korwin offered business justifications for the company's actions, none of which were related to Boltz's injury except for the refusal to allow him to return to work. (*Id.*) For example, Korwin stated that Yvonne Boltz was terminated for poor performance, including poor results in the China operations. Finally, Korwin reiterated the company's position that Boltz could not return to work until he was able to work in the office, work full-time or almost full-time, perform all of his duties, and travel as necessary. (*Id.*)

On December 23, 2015, Boltz alleges that he spoke by telephone with Principal Group, UPC's disability insurance carrier, about the status of his short-term disability claim. UPC denied this allegation. (Doc. 20 at PageID 293–94.) Boltz or Principal Group contacted Beach about his insurance benefits that same day. (Doc. 19-1 at PageID 270; Doc. 27-1 at PageID 485.)

Oleszkiewicz reprimanded Boltz in an email that same day for making the call to Beach stating that Beach had "*not* been involved in any of the discussions about your return." (*Id.* at PageID 485 (emphasis in the original).) He called Boltz's action "insubordinate" and stated that "further repetition of your conduct in going around my back in this or a like manner will result in discipline, or worse." (*Id.*) Oleszkiewicz's statement that Beach had not been involved in the discussions concerning Boltz's return to work is inconsistent with the written evidence set forth above. Oleszkiewicz had directed Boltz to consider Beach as his contact person for his disability and medical information in the November 23, 2015 letter. (*Id.* at PageID 460–61.) Beach was

included in email discussions about Boltz needing medical authorization to return to work at the office.  (*Id.* at PageID 463–68.)

Oleskiewicz also reiterated UPC's position that Boltz was unable to return to work for the company at that time:

> Jennifer [Beach] also reports that you indicated an intention to return to work effectively January 4.  Eric, this is a topic on which we have had several communications.  The Company cannot take the word of an unknown insurance company representative on the phone, about your abilities or intentions.  We need a note from each of your currently-treating physicians (your general physician and your orthopedist), either releasing you from their care, or releasing you to return to work with or without restrictions.
>
> Once we have those notes we will assess the situation including your possible return to work.

(*Id.* at PageID 485.)

The following week, on December 31, 2015, Principal Group terminated Boltz's short-term disability benefits because he had been released to return to work.  (Doc. 33-2 at PageID 665.)

Boltz submitted his letter of resignation to UPC on December 30, 2015 effective on January 29, 2016.  He stated in part in the letter:

> . . . [L]ast week I received an email from [Oleszkiewicz] threatening me with discipline ("or worse") for alleged insubordination.  His email followed a conference call I attended with a representative from Principal, the disability insurance carrier, and Jennifer Beach.  *Principal* initiated the call, not me.  [Beach] was the contact that Principal had in their files and they wanted to speak with her to understand why I had not been authorized to return to work.  Yet [Oleszkiewicz] accused me of "going around his back."  I didn't tell Principal to contact [Beach].  But even if I had, [Oleszkiewicz] previously identified [Beach] specifically as my point of contact on this subject.  This is madness.
>
> It is abundantly clear to me that whenever (if ever) you and [Oleszkiewicz] allow me to return to work, it will be a toxic environment awaiting me.  While I am proud of the resilience I have shown in response to the life-changing injury I suffered three months ago, I do not believe my physical and mental health could withstand working under these conditions.  I have no choice but to resign, an outcome which I strongly believe has been the company's intended result.

> Please consider this my letter of resignation, effective in 30 days (i.e., January 29, 2016). I am deeply saddened that my longstanding employment has ended under these circumstances.

(Doc. 19-1 at PageID 270 (emphasis in the original).) During his deposition, Oleszkiewicz denied that he would have fired Boltz, and he testified that he wished Boltz still worked for UPC. (Oleszkiewicz Dep., Doc. 33-1 at PageID 605.)

## B.     Procedural History

Eric and Yvonne Boltz initiated this lawsuit against UPC, Nitrex, and Novacap on June 22, 2016 in the Hamilton County, Ohio Common Pleas Court as case number A 1603643. (Doc. 1 at PageID 11–25.) Defendants removed the case to the District Court on June 28, 2016.

The Boltzes filed an Amended Complaint with leave of the Court on September 30, 2016. (Doc. 19.) They assert four claims for relief:

> Count I: Eric Boltz—Disability discrimination in violation of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12112 and Ohio Revised Code §§ 4112.02(A) and 4112.02(J);
>
> Count II: Yvonne Boltz —Associational disability discrimination in violation of the ADA, 42 U.S.C. § 12112, and Ohio Revised Code §§ 4112.02(A) and 4112.02(J);
>
> Count III: Eric Boltz—Unlawful retaliation in violation of the ADA, 42 U.S.C. § 12203, and Ohio Revised Code §§ 4112.02(A) and 44112.02(J);
>
> Count IV: Yvonne Boltz— Unlawful retaliation in Title VII, 42 U.S.C. § 2000e, et seq., and Ohio Revised Code §§ 4112.02(A) and 44112.02(J).

(Id. at PageID 263–67.) Defendants filed their Answer to the Amended Complaint on October 14, 2016. (Doc. 20.)

Defendants now move for partial summary judgment as to only the disability discrimination and retaliation claims asserted by Eric Boltz in Counts I and III. Defendants concede that discovery was not complete when they filed the Motion. (Doc. 27 at PageID 426.) However, they argue that existing discovery establishes that Boltz's claims fail as a matter of

law, primarily because Boltz cannot establish that he was a *qualified* individual with a disability when he was not medically cleared to return to work at the office.  Plaintiffs respond that genuine disputes of material fact exist precluding summary judgment.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A

dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   ANALYSIS

Eric Boltz alleges in the Amended Complaint that Defendants discriminated against him on the basis of his disability by (1) refusing his request for a reasonable accommodation and the right to return to work and (2) constructively terminating his employment. He also asserts that Defendants retaliated against him for reporting Oleszkiewicz's discriminatory statements and conduct to Nitrex's President by constructively terminating his employment.[7] The Court will examine the failure to accommodate and the constructive discharge claims in turn. The Ohio and federal anti-discrimination statutes contain similar prohibitions against disability discrimination, and courts rely on interpretations of the ADA as persuasive authority in interpreting Ohio's disability discrimination law. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206–07 (1998). Thus, the Court will analyze Plaintiff's disability discrimination claims under the ADA for purposes of both his federal and state disability discrimination claims.

### A.   Failure to Accommodate

In order to establish a failure to accommodate claim, a plaintiff must show that: (1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without

---

[7] Boltz asserts that Nitrex and Novacap are either directly liable for the conduct of UPC or that they are alternatively liable for aiding and abetting UPC's discriminatory conduct in violation of Ohio Revised Code § 4112.02(J). Defendants argue that the "aiding and abetting" subclaim is derivative of the claim against UPC and fails upon the same basis. (Doc. 27 at PageID 424 n.4.) The Court will treat the claims together for purposes of this Order.

reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015); *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 666–667 (S.D. Ohio 2013) (citing *Johnson v. Cleveland City Sch. Dist.,* 443 F. App'x 974, 982–83 (6th Cir. 2011)). A failure to accommodate claim involves direct evidence, and the *McConnell-Douglas* burden-shifting framework is inapplicable. *See Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 619 (N.D. Ohio 2014).

The parties agree that Eric Boltz is an individual with a disability for purposes of the ADA, 42 U.S.C. § 12102(1), and Ohio Revised Code § 4112.01(13). The primary dispute is whether Boltz was qualified for the position of VP Operations after his accident. Boltz's neurosurgeon, Dr. Napoli, and his primary physician, Dr. Moody, authorized Boltz to work from home in late November 2015. On December 8, 2015, Dr. Napoli then authorized Boltz to work from home and, as pain allowed, in the office for periods of time with a goal of working full days in the office by the end of December 2015.[8] Boltz contends that he remained qualified for the VP Operations position and that UPC denied him the opportunity to return to work. Defendants assert that Boltz was no longer qualified for the VP Operations position after the accident because he could not work predictably and regularly on-site at UPC's facility. Nonetheless, despite the fact that Defendants believed that Boltz was no longer qualified for his position, UPC offered him an accommodation in the form of a leave of absence.

The ADA protects "qualified individual[s]" defined as those "who, with or without reasonable accommodation, can perform the essential functions of the employment position that

---

[8] Defendants argue that the December 8, 2015 authorization from Dr. Napoli releasing Boltz to work in the office as pain allows is insufficient because Dr. Moody was Boltz's primary physician. This argument raises a question of fact more appropriate for determination by the trier of fact at trial.

such individual holds or desires." 42 U.S.C. § 12111(8).  The labor regulations define "essential

functions" as "the fundamental job duties of the employment position," as opposed to the

"marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  A job function can be

considered essential for many reasons, including the following:

> (i) The function may be essential because the reason the position exists is
> to perform that function;
>
> (ii) The function may be essential because of the limited number of
> employees available among whom the performance of that job function
> can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the
> position is hired for his or her expertise or ability to perform the particular
> function.

29 C.F.R. § 1630.2(n)(2).

Reasonable accommodations can include "job restructuring, [and] part-time or modified

work schedules."  42 U.S.C. § 12111(9)(B).  However, reasonable accommodations cannot

include removing an essential job function.  *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th

Cir. 2015) (*en banc*).  EEOC regulations set forth seven factors relevant to the determination of

whether a function is essential:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing
> applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).[9]

Defendants contend that regular and predictable attendance on-site is an essential requirement of most positions, and specifically Boltz's managerial position, under Sixth Circuit case law.  "Regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones."  *Ford Motor Co.*, 782 F.3d at 762–63.  "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (citation omitted).  The Sixth Circuit observed in *Ford Motor Company* that for most jobs the seven factors in 29 C.F.R. § 1630.2(n)(3) "point towards finding regular and predictable on-site attendance to be essential."  782 F.3d at 762.  The Sixth Circuit also relied on EEOC written guidance stating that the ADA does not require employers to offer telework programs to all employees.  *Id.* (citing EEOC Fact Sheet, *Work at Home/Telework as a Reasonable Accommodation* (Oct. 27, 2005), https://www.eeoc.gov/facts/telework.html). The Sixth Circuit stated that when regular attendance at work is determined to be an essential function of a job, an employee's request to telecommute or work from home as an accommodation is *per se* unreasonable.  *Id.* at 761, 763; *see also Watters v. Summit Cty., Ohio*, no. 5:14cv2390, 2016 WL 3544752, at *7 (N.D. Ohio June 29, 2016).

However, neither *Ford Motor Co.* nor the EEOC mandate the conclusion that on-site attendance is an essential function of all positions.  The Sixth Circuit held that on-site attendance is an essential job function of "most jobs[,]" not all jobs.  *Ford Motor Co.*, 782 F. 3d at 762–63.

---

[9]  At least two of these factors are derived from the text of the ADA itself.  "For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).

"The *Ford* decision leaves open the possibility that regular attendance might not be an essential function of every job . . . ."  *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 392 (6th Cir. 2017).  Also, the EEOC stated that permitting an employee to work at home can be a reasonable accommodation if "the job, or parts of the job, can be performed at home without causing significant difficulty or expense."  EEOC Fact Sheet, *Work at home/Telework as a Reasonable Accommodation* (Oct. 27, 2005), https://www.eeoc.gov/facts/telework.html.  The EEOC made the following recommendation:

> Several factors should be considered in determining the feasibility of working at home, including the employer's ability to supervise the employee adequately and whether any duties require use of certain equipment or tools that cannot be replicated at home.  Other critical considerations include whether there is a need for face-to-face interaction and coordination of work with other employees; whether in-person interaction with outside colleagues, clients, or customers is necessary; and whether the position in question requires the employee to have immediate access to documents or other information located only in the workplace.  An employer should not, however, deny a request to work at home as a reasonable accommodation solely because a job involves some contact and coordination with other employees.  Frequently, meetings can be conducted effectively by telephone and information can be exchanged quickly through e-mail.

*Id.*

Defendants identify multiple facts to support their argument that working on-site, including traveling to other UPC facilities, was an essential function of Boltz's position as VP Operations.  Boltz regularly and consistently worked on-site at UPC's West Chester, Ohio facility.  He met with other employees at the facility on a regular basis.  Jennifer Beach, the UPC controller and human resources manager, appears to state that Boltz spent between 50% and 90% of his days in the West Chester facility.[10]  Boltz managed not only the local facility, but also a

---

[10] Her statement is as follows:

facility in Wisconsin and two facilities in China.  He travelled approximately thirty days per year to UPC facilities and to meet with current and prospective customers.

Boltz offers the following facts in rebuttal.  UPC supported a home office for him.  He had multiple computer displays, a VPN firewall, and teleconferencing equipment at his house. He routinely participated in conference calls and performed technical duties from home.  He had no business need to travel to China during late 2015 or in the first quarter of 2016.  In fact, Oleszkiewic testified at his deposition that Boltz could manage the Milwaukee office effectively from his home office and that Boltz "probably" could effectively manage the China office for two or three months from his home office.  (Oleszkiewicz Dep., Doc. 33-1 at PageID 585–86, 588–89.)  Finally, Boltz engaged in work on UPC's behalf during his hospital stay immediately following the accident.  The Court concludes that a genuine disputed issue of material fact precludes summary judgment on the issues of whether regular and predictable on-site attendance was an essential function of, and whether Boltz was qualified for, the VP Operations position. *Cf. Rorrer v. City of Stow*, 743 F.3d 1025, 1043 (6th Cir. 2014) ("Determining whether a function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'") (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013)).

Finally, to the extent that Defendants argue that Boltz rejected their reasonable accommodation of an indefinite leave of absence, the Court finds that a factfinder could conclude that such purported accommodation was not reasonable.  Boltz was on an unpaid leave of absence.  The disability insurance carrier terminated his disability benefits on December 31,

---

During the time that Mr. Boltz worked for UPC, he spent during any particular period between 90% of the Company's scheduled workdays in his West Chester office, to at least 50% of his workdays at that office. In other words, there was never a period of time during Mr. Boltz' employment that he worked less than 50% of the Company's scheduled workdays when he was scheduled to work in the West Chester office, and usually, more than that.

(Beach Dec., Doc. 27-1 at PageID 490.)

2015 finding that he could return to work.  A jury could conclude that it was unreasonable for Defendants to prohibit Boltz from returning to work until he could work in substantially the same manner in which he worked before he became disabled.

The Court will deny summary judgment to Defendants on the failure to accommodate disability discrimination claim.

**B.      Constructive Discharge**

Boltz also asserts that he was constructively discharged in retaliation for reporting Oleszkiewicz's discriminatory statements and conduct.[11]  The contours of a constructive discharge claim are familiar.  "A constructive discharge requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Smith v. Henderson*, 376 F.3d 529, 533–34 (6th Cir. 2004) (internal quotations and citations omitted).  To demonstrate a constructive discharge under federal law, a plaintiff must prove that (a) his employer deliberately created objectively intolerable working conditions and (b) the employer did so with the intention of forcing him to quit.  *Henry v. Abbott Labs.*, 651 F. App'x 494, 507 (6th Cir. 2016); *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014).  An employee's subjective beliefs are not sufficient to meet the burden of establishing a constructive discharge.  *Henry*, 651 F. App'x at 508.  An employer's intent "can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions."  *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).  The Sixth Circuit has observed that an employer's intent does not appear to be a part of the

---

[11]  Defendants assume in the Motion for Summary Judgment that Boltz was asserting two separate retaliatory acts: (1) denial of his accommodation request to work at home and (2) constructive discharge.  (Doc. 27 at PageID 437.)  Plaintiff clarifies in the Memorandum in Opposition that the alleged constructive discharge is the adverse employment action upon which his retaliation claim is based.  He suggests that the Defendants' refusal to permit him to return to work is merely evidence supporting a finding of constructive discharge.  (Doc. 32 at PageID 548 n. 10.)

constructive discharge standard under Ohio law. *Henry*, 651 F. App'x at 507 (citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St. 3d 578, 664 N.E.2d 1272, 1274 (1996)).

Defendants argue that Boltz cannot prove a retaliation claim because he cannot establish either that he was constructively discharged or that he there was a causal connection between the protected conduct and the purported adverse action. To begin, Defendants argue that Boltz faced at most vague threats of termination and that threats to discharge an employee do not amount to constructive discharge. *See Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005) ("[I]t is settled in this circuit that a threat to discharge is not an adverse employment action."). Their argument is not persuasive in the circumstances of this case. "When an employer acts in a manner so as to have communicated to a reasonable employee that [he] will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Laster*, 746 F.3d at 728 (adopting Seventh Circuit standard). Constructive discharge occurs where the employer's actions demonstrate that "the handwriting was on the wall and the axe was about to fall." *Id.* (citation omitted). Several events occurred after Boltz became disabled that taken together and in context support Boltz's constructive discharge claim.

UPC took several actions in the immediate aftermath of the Boltz's injury that raised a reasonable suspicion that UPC did not want Boltz to return as VP Operations. First, UPC exercised its option to cancel the extension of Boltz's employment contract on October 27, 2015. Second and perhaps most troubling, Oleszkiewicz, UPC's President, explicitly questioned whether Boltz could lead the company from his wheelchair. Third, UPC terminated Boltz's home access to the company's computer network and took away his responsibilities. Finally, UPC denied Boltz's requests to return to work by starting work at home and transitioning to work at the office.

Defendants argue that events that happened before November 25, 2015—the date Boltz took protected conduct by emailing his concerns to Korwin, Nitrex's President—are irrelevant to a determination of whether he was subjected to an adverse employment decision in the form of a constructive discharge. The Court disagrees. While it is true that a plaintiff must prove that he was subjected to an adverse action after and in response to protected conduct, events occurring after the protected conduct do not happen in a vacuum. Events occurring prior to the protected conduct can give relevant context to the causation, employer intent, and intolerable conditions analyses.

A reasonable jury could conclude that the parties' relationship further deteriorated after Boltz emailed his concerns to Korwin. Korwin denied that UPC did not want Boltz to return. However, he also accused Boltz of setting up the company for a lawsuit. He stated that Boltz's letter and his actions caused him to have concerns about Boltz's management judgment and honesty and stated that he would have to "*clear certain doubts*" before Boltz could be reinstated. (Doc. 27-1 at PageID 480 (emphasis added).

Additionally, after the disability insurance provider contacted Beach, a human resources manager, about Boltz's return to work, Oleszkiewicz accused Boltz of insubordination. He stated that Boltz could be subjected to "discipline, or worse" for going behind his back. Oleszkiewicz justified his accusation by stating that Beach had not been involved in discussions about Boltz returning to work, when in fact, Oleszkiewicz personally had instructed Boltz to use Beach as his contact person for disability and medical information. A jury could conclude that the insubordination accusation was pretextual. Oleszkiewicz concluded that UPC would consider only Boltz's "*situation, including [his] possible* return to work" after each of his treating physicians gave him a medical release. (*Id.* at PageID 485 (emphasis added).) Of

course, by that time UPC had repeatedly deemed insufficient medical authorizations releasing Boltz to work from home and transition to the UPC facility over time.

Therefore, at the end of December 2015, a reasonable jury could find that Boltz was caught in a Catch-22. He had medical authorization to return to work on a gradual basis, and his short-term disability benefits ended for that reason, but UPC would not permit him to return to the VP Operations position from his *unpaid* leave-of-absence. Both Korwin and Oleszkiewicz arguably had treated his attempts to return to work as insubordinate. A reasonable jury could conclude that the writing was on the wall that UPC would never permit Boltz to return to the VP Operations position. The Court will deny summary judgment to Defendants on the constructive discharge-based disability retaliation claim.

IV.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment (Doc. 27) is **DENIED**.

DATED this 16th day of May, 2017.

BY THE COURT:

S/Susan J. Dlott_____<br>SUSAN J. DLOTT<br>United States District Judge